## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | |
|---|---|
| KAREN LOWY, individually and as parent and next friend of N.T., <br><br>     *Plaintiffs*, <br><br>     v. <br><br> DANIEL DEFENSE, LLC; FAB DEFENSE, INC.; FAB MANUFACTURING & IMPORT OF INDUSTRIAL EQUIPMENT LTD.; BRAVO COMPANY USA, INC.; LOYAL 9 MANUFACTURING, LLC; FOSTECH, INC.; HEARING PROTECTION, LLC; CENTURION ARMS, LLC; MAGPUL INDUSTRIES CORP.; FEDERAL CARTRIDGE COMPANY; VISTA OUTDOOR, INC.; FIOCCHI OF AMERICA, INC.; FIOCCHI MUNIZIONI S.P.A.; STARLINE, INC.; SUREFIRE, LLC; TORKMAG, INC.; and JOHN DOES 1–20, <br><br>     *Defendants*. | Case No. <br><br> **<u>DEMAND FOR JURY TRIAL</u>** |

## <u>COMPLAINT</u>

Karen Lowy, individually and as parent and next friend of minor N.T., by and through their attorneys, state as follows for their Complaint against Defendants Daniel Defense, LLC; FAB Defense, Inc.; FAB Manufacturing & Import of Industrial Equipment Ltd.; Bravo Company USA, Inc.; Loyal 9 Manufacturing, LLC; FOSTECH, Inc.; Hearing Protection, LLC; Centurion Arms, LLC; Magpul Industries Corp.; Federal Cartridge Company; Vista Outdoor, Inc.; Fiocchi of America, Inc.; Fiocchi Munizioni S.p.A.; Starline, Inc.; Surefire, LLC; Torkmag, Inc.; and John Does 1–20 (collectively, "Defendants"):

## INTRODUCTION

1.     On April 22, 2022, as she did most afternoons, Plaintiff Karen Lowy was waiting in her car in the school pick up line to pick up her minor daughter, N.T., from Edmund Burke School in Northwest Washington, D.C.

2.     Without warning, Raymond Spencer (the "Shooter") opened fire from an apartment window in a sniper-style attack on the unsuspecting children leaving school and the parents waiting for them, ultimately firing at least 239 rounds in a densely populated area of the District before dying by suicide.

3.     Several of the rounds fired from one or more AR-15 weapons shredded through Ms. Lowy's car, critically injuring her.

4.     Ms. Lowy's young daughter, N.T., heard the gunshots from inside the school, where she was getting ready for pick up. Her teacher started yelling at the students to flee to safety. N.T. froze, but was eventually pulled up the stairs to the school science lab. She remained barricaded inside the school until late into the evening, when she eventually was transported to a reunification center where she waited, hoping that her mom would get off of a bus that had transported adult survivors of the Shooting. She never did.

5.     For hours, Ms. Lowy's family members frantically searched for information about her whereabouts and condition. Fortunately, Ms. Lowy survived the attack, though only after being twice resuscitated by emergency medical teams. But her life—and the lives of her family members—will never be the same.

6.     The mass shooting at Edmund Burke School (the "Shooting") was the foreseeable and entirely preventable result of a chain of events initiated by Daniel Defense, LLC; FAB Defense, Inc.; FAB Manufacturing & Import of Industrial Equipment Ltd.; Bravo Company USA,

Inc.; Loyal 9 Manufacturing, LLC; FOSTECH, Inc.; Hearing Protection, LLC; Centurion Arms, LLC; Magpul Industries Corp.; Federal Cartridge Company; Vista Outdoor, Inc.; Fiocchi of America, Inc.; Fiocchi Munizioni S.p.A.; Starline, Inc.; Surefire, LLC; Torkmag, Inc.; and John Does 1–20.

7.     For years, these manufacturers have deceptively and unfairly marketed their assault rifles, rifle accessories, and ammunition in ways designed to appeal to the impulsive, risk-taking tendencies of civilian adolescent and post-adolescent males—the same category of consumers Defendants have watched, time after time, commit the type of mass shooting that unfolded again at the Edmund Burke School.

8.     The Defendants employ sales and marketing practices that create and feed a consumer base of young, civilian men who keep the money rolling in by purchasing not only the rifles, but all the deadly accessories that go with them—ammunition, optics, high-capacity magazines, silencers, and laser-aiming devices, among others. When these consumers foreseeably use Defendants' assault rifles, rifle accessories, and ammunition in mass shootings, the families and communities affected suffer while Defendants celebrate boosts to their bottom lines. Defendants know that demand for their weapons, weapon accessories, and ammunition increase in the aftermath of mass shootings. Rather than behave responsibly, Defendants stoke fear of gun regulations and encourage stockpiling after shootings to increase that demand.

9.     The marketing and sales practices of Defendants and other entities within the gun industry—including their practices in the State of Virginia—are the beginning and pivotal links in a foreseeable and predictable chain of events resulting in many mass shootings in America each year. With full knowledge and appreciation of their role in facilitating these mass shootings, Defendants continue to intentionally and recklessly advertise, market, promote, and sell a warrior

mentality that a certain subset of youths, like this Shooter who live-streamed his crime, fantasize will make them legendary. Defendants have not taken even the simplest steps to prevent or discourage young, impulsive would-be mass shooters from acquiring their weapons, weapon accessories, and ammunition and using them to inflict harm, such as implementing age gates on their social media accounts to align with any state and local regulations governing the age at which a person could purchase or use the relevant products, warning consumers about the dangers of assault rifles, or even avoiding advertising illegal modifications to and uses of weapons. Defendants' practices are negligent and unlawful.

10.     After years of conditioning by perverse and pervasive marketing by Defendants and the gun industry at large, would-be mass murderers—like the Shooter—naturally look to obtain the products associated with the idolized self-sufficient warrior mentality featured by these promotions.

11.     Before renting the apartment in D.C. from which he committed the Shooting, the Shooter lived in Fairfax County, Virginia for about a year. He maintained this Virginia apartment through the date of the Shooting.

12.     As D.C. Mayor Muriel Bowser described, the Shooter "bought weapons of war legally in the state of Virginia and brought those guns to D.C. to terrorize our community."[1]

13.     The Shooter traveled around Northern Virginia to build his stockpile in the months leading up to the Shooting, and also had numerous weapons components and accessories shipped to his Virginia address.

---

[1] *D.C. Mayor Muriel Bowser talks about a multipronged approach to curb gun violence*, NPR (Apr. 24, 2022, 4:58 PM), https://www.npr.org/2022/04/24/1094567899/d-c-mayor-muriel-bowser-talks-about-a-multipronged-approach-to-curb-gun-violence.

14.     The Shooter purchased a FosTecH Tech-15 rear, manufactured by Defendant FOSTECH, Inc. from a firearms dealer in Fairfax, Virginia on October 2, 2021. He went to a different dealer, in Alexandria, Virginia, on January 16, 2022, to get Defendant Hearing Protection, LLC's MK1 Griffin Armament lower.

15.     While visiting shooting ranges to practice using his guns before the Shooting, the Shooter made additional weapons purchases: he bought a lower receiver made by Defendant Loyal 9 Manufacturing, LLC on November 6, 2021 from Silver Eagle Group in Loudon County, Virginia. And he bought Defendant Centurion Arms, LLC's F-15 receiver on December 16, 2021 from Elite Shooting Sports in Prince William County, Virginia.

16.     The Shooter also bought Defendant Daniel Defense, LLC's DDM4 V7 rifle, the exact same AR-15 rifle that was used by another violent young man just over a month later to conduct a mass shooting at Robb Elementary in Uvalde, Texas—and Daniel Defense's DD magazine, a high-capacity, 32-round magazine that is designed for fast and secure reloads.

17.     The Shooter also visited Sharpshooters Range in Fairfax County to practice using his weapons in the days, weeks, and months leading up to the Shooting.

18.     Once his arsenal of choice was amassed and assembled at his Virginia apartment, the Shooter transported the weapons made by Defendants Daniel Defense, LLC; FOSTECH, Inc.; Hearing Protection, LLC; Loyal 9 Manufacturing, LLC; and Centurion Arms, LLC; along with an AR-15 style rifle and M-Lok system made by Defendant Bravo Company USA, Inc. and a buttstock made by Defendant FAB Defense, Inc. to his D.C. apartment overlooking the Edmund Burke School to execute the Shooting.

19.     The Shooter also stockpiled for his use in the Shooting rifle accessories, including a high-capacity drum and grip from Defendant Magpul Industries Corp., magazines from

Defendants Daniel Defense, LLC; Surefire, LLC; and Torkmag, Inc.; and ammunition from Defendants Federal Cartridge Company; Fiocchi of America, Inc.; and Starline, Inc.

20.    The Shooter left behind at his Virginia apartment numerous other weapons, weapon accessories, and boxes of ammunition—choosing instead to use Defendants' products he had purchased and custom-assembled for his violent rampage.

21.    For years, Defendants and other entities in the gun industry have, through their misconduct and illegal practices, profited off the actions of disturbed young men like the Shooter. They willfully ignored the public's right to be safe from violence by placing weapons and other tools of war into the Shooter's hands. They must be held accountable.

## PARTIES

22.    Plaintiff Karen Lowy is a resident of Maryland. She is a victim of the Shooting who was shot multiple times, surviving only after being resuscitated twice by emergency medical teams. In addition to the physical injuries and pain that Ms. Lowy continues to endure, she suffered, and continues to suffer, severe emotional distress stemming from the Shooting. Ms. Lowy is the parent of minor child N.T., who is a resident of Maryland. N.T. was a student at Edmund Burke School at the time of the Shooting, and sheltered in place for hours in its aftermath. N.T. suffered, and continues to suffer, severe emotional distress stemming from the Shooting.

23.    Defendant Daniel Defense, LLC is a Georgia limited liability company that manufactures and sells firearms and firearms accessories with its principal place of business at 101 Warfighter Way, Black Creek, GA 31308, and also does business under the name Daniel Defense, Inc. (hereinafter, collectively, "Daniel Defense"). Upon information and belief, Daniel Defense, LLC's members are Marvin Daniel, Roger Mustian, and Marsha Grovenstein, each of whom is a resident of Georgia.

24.     Defendant FAB Defense, Inc. is a Florida for-profit corporation that manufactures and sells firearms with its principal place of business at 873 Hull Road Unit 5, Ormond Beach, FL 32174. Upon information and belief, Defendant FAB Defense, Inc. is a subsidiary of Defendant FAB Manufacturing & Import of Industrial Equipment Ltd. (hereinafter, collectively, "FAB").

25.     Defendant FAB Manufacturing & Import of Industrial Equipment Ltd. is a corporate entity with its principal place of business in Israel. Upon information and belief, Defendant FAB Manufacturing & Import of Industrial Equipment Ltd. is the parent company of Defendant FAB Defense, Inc.

26.     Defendant Bravo Company USA, Inc. (hereinafter, "BCM") is a Wisconsin corporation that manufactures and sells firearms with its principal place of business at 340 Maple Avenue, Hartland, WI 53029.

27.     Defendant Loyal 9 Manufacturing, LLC (doing business as Sons of Liberty Gun Works (hereinafter, "SOLGW")) is a Texas limited liability company that manufactures and sells firearms with its principal place of business at 2828 S. Laredo Street, San Antonio, TX 78207. Upon information and belief, SOLGW's members are Michael Mihalski, Kyle Grotheus, and Edward Rhodes, each of whom is a resident of Texas.

28.     Defendant FOSTECH, Inc. (hereinafter, "FosTecH") is an Indiana for-profit corporation that manufactures and sells firearms with its principal place of business at 320 Myers Street, Seymour, IN 47274.

29.     Defendant Hearing Protection, LLC (doing business as Griffin Armament (hereinafter, "Griffin Armament")) is a Wisconsin limited liability company that manufactures and sells firearms with its principal place of business at 801 S. 12th Street, Watertown, WI 53094.

Upon information and belief, Griffin Armament's members are Evan Green and Austin R. Green, each of whom is a resident of Wisconsin.

30.     Defendant Centurion Arms, LLC (hereinafter, "Centurion Arms") is an Indiana limited liability company that manufactures and sells firearms with its principal place of business at 390 E. Old Plank Road, Bargersville, IN 46106. Upon information and belief, Centurion Arms' members are LaMonte LeClair, who is a resident of California, and Corrie LeClair, who is a resident of Indiana.

31.     Defendant Magpul Industries Corporation (hereinafter, "Magpul") is a Delaware corporation that manufactures and sells firearms accessories with its principal place of business at 5408 W. Highway 290, Austin, TX 78735.

32.     Defendant Federal Cartridge Company (doing business as Federal Premium Ammunition (hereinafter, "Federal Premium Ammunition")) is a Minnesota business corporation that manufactures and sells ammunition with its principal place of business at 900 Ehlen Drive, Anoka, MN 55303. Upon information and belief, Defendant Federal Cartridge Company was at all relevant times a subsidiary of Defendant Vista Outdoor, Inc.

33.     Defendant Vista Outdoor, Inc. is a Delaware corporation with its principal place of business at 1 Vista Way, Anoka, MN 55303. Upon information and belief, Defendant Vista Outdoor, Inc. was at all relevant times the parent company of Defendant Federal Cartridge Company.

34.     Defendant Fiocchi of America, Inc. is a Missouri for-profit corporation that manufactures and sells ammunition with its principal place of business at 6930 N. Fremont Road, Ozark, MO 65721. Upon information and belief, Defendant Fiocchi of America, Inc. is a subsidiary of Defendant Fiocchi Munizioni S.p.A (hereinafter, collectively, "Fiocchi").

35.     Defendant Fiocchi Munizioni S.p.A. is a corporate entity with its principal place of business in Italy. Upon information and belief, Defendant Fiocchi Munizioni S.p.A. is the parent company of Defendant Fiocchi of America, Inc.

36.     Defendant Starline, Inc. (doing business as Starline Brass (hereinafter, "Starline Brass")) is a Missouri for-profit corporation that manufactures and sells ammunition with its principal place of business at 1300 W. Henry Street, Sedalia, MO 65301.

37.     Defendant Surefire, LLC is a California limited liability company that manufactures and sells firearms accessories with its principal place of business at 18300 Mt. Baldy Circle, Fountain Valley, CA 92708. Upon information and belief, Surefire, LLC's members are Joel D. Smith and Sean Vo, each of whom is a resident of California.

38.     Defendant Torkmag, Inc. is a Florida for-profit corporation that manufactures and sells firearms accessories with its principal place of business at 2240 Hemmingway Drive, Suite H, Fort Myers, FL 33912.

39.     The true names and capacities, whether individual, corporate, partnership, or otherwise, of other Defendants, herein named as John Does 1–20, inclusive, are unknown to Plaintiffs. Plaintiffs therefore sue said Defendants by such fictitious names. Plaintiffs will move to amend this Complaint to substitute said Defendants' true names and capacities when the same have been ascertained.

40.     Defendants John Does 1–20 are additional individuals or entities who manufactured, advertised, and/or sold the weapons, weapon accessories, and ammunition used in the Shooting, or who otherwise engaged in negligent, reckless, or intentional misconduct with respect to the Shooting and thereby caused injuries to Ms. Lowy and N.T.

## JURISDICTION AND VENUE

41.     This Court has jurisdiction under 28 U.S.C. § 1332. Ms. Lowy and N.T. are citizens of Maryland. No Defendant is a citizen of Maryland: Daniel Defense is a citizen of Georgia; FAB Defense, Inc. and Torkmag, Inc. are citizens of Florida; FAB Manufacturing & Import of Industrial Equipment Ltd. is a citizen of Israel; BCM and Griffin Armament are citizens of Wisconsin; SOLGW is a citizen of Texas; FosTecH is a citizen of Indiana; Centurion Arms is a citizen of Indiana and California; Federal Premium Ammunition is a citizen of Minnesota; Vista Outdoor, Inc. is a citizen of Delaware and Minnesota; Magpul is a citizen of Delaware and Texas; Fiocchi of America, Inc. and Starline Brass are citizens of Missouri; Fiocchi Munizioni S.p.A. is a citizen of Italy; and Surefire, LLC is a citizen of California. The amount in controversy exceeds $75,000.

42.     This Court is a proper venue for this action under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to Plaintiffs' claims occurred in this District as the Shooter purchased Defendants' weapons, accessories, and ammunition while he was a resident of Fairfax County, Virginia. Furthermore, the Shooter purchased at least four of Defendants' weapons from dealers located in this District and, upon information and belief, purchased the other weapons, accessories, and ammunition at retailers within this District or purchased them online while in Fairfax County, Virginia and had them shipped to him there.

## GENERAL ALLEGATIONS

43.     Each Defendant enabled the Shooter to carry out the Shooting. They knowingly sought to place their weapons, accessories, and ammunition in the hands of disturbed young men by targeting and exploiting the risk-seeking—and often troubling—desires of these consumers. The Shooter and other would-be mass shooters are highly susceptible to disturbing promotional

messages, which foreseeably feed the desires of these young men to act out their militaristic fantasies on a civilian population.

**Defendants Daniel Defense, FAB, BCM, SOLGW, FosTecH, Griffin Armament, and Centurion Arms Design and Market Weapons of War to Civilians**

  **a. The Evolution of the Assault Weapon**

  44. The assault rifles manufactured and promoted by Defendants Daniel Defense, FAB, BCM, SOLGW, FosTecH, Griffin Armament, and Centurion Arms to consumers like the Shooter have military origins. They were originally designed to kill as many people as possible as quickly as possible. Even today, Defendants Daniel Defense, FAB, BCM, SOLGW, FosTecH, Griffin Armament, and Centurion Arms promote these rifles to civilians who fantasize about military-style combat.

  45. During World War I, infantry soldiers were generally equipped with long-range battle rifles, which did not meet the needs of the trench warfare that characterized that war. As a result, countries began developing more compact, fast-firing weapons, such as the submachine gun. By World War II, the German military had developed the StG 44, also known as the "storm gun," and the "father of all assault rifles," because "[a]fter the war it was examined and dissected by almost every major gunmaking nation and led, in one way and another, to the present-day 5.56mm assault rifles."[2]

  46. The first AR-15 rifles were designed in 1957 by Armalite, a small arms engineering company, for the U.S. military.[3] Armalite's goal was to create a lightweight portable select-fire rifle that would allow soldiers to quickly put many rounds on target from distances of a quarter

---

[2] Violence Policy Center, *Understanding the Smith & Wesson M&P15 Semiautomatic Assault Rifle Used in the LAX Shooting* at 10 (Nov. 2013) (citation omitted).

[3] "AR" stands for "Armalite Rifle."

mile or more.[4] Thus, the AR-15 was designed to be effective in combat and to kill or disable as many enemy soldiers as possible as quickly as possible, even from far away. Although Armalite developed the first AR-15, today the term "AR-15" designates the type of the firearm, rather than the brand.

47.     Armalite's design performed so well that the U.S. military concluded that a five- or seven-man squad armed with AR-15s (known within the military as M16 rifles) had as good or better "hit-and-kill potential" in combat-style tests than an 11-man squad armed with older, select-fire M14 rifles. In fact, the U.S. Army directs that semiautomatic mode, rather than automatic fire, be used for virtually all purposes, because it is more effective and lethal. The Army has concluded that "[a]t ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures: shots per target, trigger pulls per hit, and even time to hit."[5]

48.     The distinctive appearance of assault weapons is the result of the gun's functional design. Assault weapons "have incorporated into their design specific features that enable shooters to spray ('hose down') a large number of bullets over a broad killing zone, without having to aim at each individual target. These features not only give assault weapons a distinctive appearance, they make it easy to simply point the gun while rapidly pulling the trigger."[6] These design features make assault weapons particularly lethal.

49.     In 1968, Congress amended the National Firearms Act of 1934 ("NFA") and expanded the definition of machinegun to include "any weapon which shoots, is designed to shoot,

---

[4]     A fully automatic rifle fires continuously as long as the trigger is held down. A semiautomatic rifle fires one round for each trigger pull, and then automatically reloads the chamber with the next round. A select-fire rifle can fire in either fully automatic or semiautomatic mode.

[5]     U.S. Dep't of Defense, *Operate Your Rifle Like a Pro: U.S. Army Official Manual*, at Chapter 7, Section II, 7–8 (2017).

[6]     Violence Policy Center, *supra* note 2, at 10–11.

or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The definition includes "the frame or receiver of any such weapon," as well as "any part" or "combination of parts designed and intended, for use in converting a weapon into a machinegun," and "any combination of parts from which a machinegun can be assembled" if those "parts are in the possession or under the control of a person." *Id.* It is a crime to possess or transfer machine guns to any person who has not undergone the required registration and authorization process. *See* 18 U.S.C. § 922(b)(4); § 922(o)(1).

50.     Interpreting this language, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") clarified in 1982 that semiautomatic firearms (both rifles and pistols) that possess design features that allow them to easily be converted to automatic weapons with "simple modification or elimination of existing component parts" were "machineguns" under the NFA.[7] That is, even if a gun was not originally a machinegun, it qualifies as one under the NFA if it can be simply modified into one.

51.     In 1994, Congress further acted to limit civilians' access to these weapons by passing a federal assault weapon ban, which sunset in 2004.

52.     As the federal assault rifle ban lapsed in 2004, the gun industry saw an opportunity to market these weapons of war to civilians.

   **b. Defendants Intentionally, Unfairly, and Deceptively Use Militaristic Messaging and Unrealistic Concerns About Combat to Market to Civilians, Including Teens and Young Adults**

53.     Despite knowing that mass shootings have been repeatedly perpetrated by young men armed with assault rifles, Defendants specifically and intentionally market their weapons,

---

[7]     ATF Ruling 82-2; ATF Ruling 82-8.

weapon accessories, and ammunition in ways that appeal to adolescent and post-adolescent males, including through social media and invocations of other brands geared toward children and young adults. They have taken no steps to guard against the sale of their weapons, weapon accessories, and ammunition to those who would foreseeably commit such violent acts and, in some cases, have even gone so far as to ridicule the idea that their advertising should not promote and encourage violence.

54.    Defendants' advertisements suggest that their weapons, weapon accessories, and ammunition are ready for active combat in war, but also appropriate for civilians to use for offensive combat-like missions. For example, according to the Oversight and Reform Committee of the U.S. House of Representatives, "Ninety percent of [Defendant Daniel Defense]'s sales are direct to civilian consumers, but the company's marketing emphasizes the tactical nature of its products."[8]

55.    These advertisements are especially salient for—and are targeted to attract—troubled young men attracted to violent combat, increasing the risk that these young men will use Defendants' deadly weapons, weapon accessories, and ammunition to perpetrate mass violence. This includes the Shooter, who joined the United States Coast Guard but was discharged before he even completed basic training.

56.    Defendants are not alone among gun industry companies in adopting this marketing strategy: a 2020 study of gun company and influencer content on YouTube and Twitter found that

---

[8]    Memorandum re: Committee's Investigation into Gun Industry Practices and Profits, 116 Cong. H. Comm. Oversight & Reform (2022).

"military, patriotic, and law enforcement themes" were "commonplace," and glorification of military gun use was easily found in contemporary gun advertising.[9]

57.     For example, Defendant Daniel Defense regularly promotes its weapons and accessories by suggesting that its rifles will enable its primarily civilian consumers to engage in combat operations. It does so through print, Facebook, and Instagram advertisements, among others, that feature imagery of combat soldiers in the field of war, and men in military fatigues with the caption, "Saturdays are for the boys." All of these advertisements encourage civilians, and particularly "boys" and young men like the Shooter, to reenact military-style exercises with Daniel Defense's weapons. And Defendant Daniel Defense specifically uses hashtags to appeal to impressionable and violent young men like the Shooter, including #gunporn and #cqbr (i.e., "close quarter battle receiver," an adaptation of the M4 rifle used by the military in close combat), while promoting its rifles for everyday use with captions like "MK18 Monday."



*Image from Daniel Defense 2022 Print Catalog*

---

[9]     Lisa Jordan et al., *Characteristics of Gun Advertisements on Social Media: Systematic Search and Content Analysis of Twitter and YouTube Posts*, 22 J. MED. INTERNET RES. 3. (2020), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7148552/.



*Daniel Defense Facebook Advertisement (March 13, 2021)*



*Daniel Defense Instagram Advertisement (October 11, 2021)*



*Daniel Defense Instagram Advertisement (September 27, 2021)*



*Daniel Defense Instagram Advertisement (May 6, 2021)*



*Daniel Defense Instagram Advertisement (June 25, 2021)*

58.     Defendant BCM similarly portrays its weapons next to bullet proof vests bearing the American flag, suggesting that they are a regular part of a U.S. soldier's uniform while serving in a theater of war.



*BCM Instagram Advertisement (March 2, 2022)*



*BCM Instagram Advertisement (February 21, 2022)*

59. Defendant Magpul portrays its weapons accessories as being used by men in full tactical gear preparing for assaults to carry out war—situations that the vast majority of its civilian consumers will never face.



*Magpul Instagram Advertisement (February 28, 2021)*



*Magpul Instagram Advertisement (February 4, 2021)*

60.     Defendant BCM encourages civilians to don this same combat tactical gear and carry its weapons in everyday life, posting images on its Instagram account of men who look like they are ready for war with captions like "Ready . . . for the weekend" and hashtags like "igmilitia."



*BCM Instagram Advertisement (September 14, 2018)*

61.     As Defendant BCM's advertising tells young men like the Shooter, the company's weapons will help them achieve what they want by force. According to Defendant BCM, with one of its weapons in hand, "[t]here's no obstacles, just opportunities."



*BCM Instagram Advertisement (July 22, 2019)*

62.     Defendant FAB, too, portrays its weapons on its Instagram account as "Ready for Duty" for militaristic use. Remarkably, one of FAB's ads from January 2022, a few months before the Shooting, even depicts men carrying its weapons in what appears to be a school building with lockers lining the walls.



*FAB Instagram Advertisement (January 13, 2022)*

63.     And Defendant Fiocchi has deployed similar imagery in marketing its ammunition on its Instagram—depicting use of its product from what appears to be the balcony of a home or office, rather than at a shooting range or in a game hunting setting.



*Fiocchi Instagram Advertisement (July 1, 2021)*

64.     Defendant Surefire, LLC, too, advertises that its products are "for those who go in harm's way, **or** anyone who demands the ultimate in quality, innovation, and performance" with an image of a man walking in the dark in tactical gear (emphasis added).



*Surefire, LLC Instagram Advertisement (August 28, 2020)*

65.     In conjunction with this militaristic messaging, gun industry Defendants publish ads stoking fear—of the government and of other civilians—to promote stockpiling of their products, which of course leads to greater sales.

66.     Defendant Magpul's Twitter account advised consumers that they could achieve "peace through superior firepower."



*Magpul Twitter Advertisement (April 12, 2022)*

67.    Defendant Torkmag, Inc. posted advertisements mocking people who use shotguns—instead of AR or AK rifles—for home defense and promoting its high-capacity magazines along with hashtags such as #bigigloo and #civilwar2electricboogaloo that refer to the anti-government extremist "Boogaloo" movement.



*Torkmag, Inc. Instagram Advertisement (August 23, 2018)*



*Torkmag, Inc. Instagram Advertisement (November 11, 2019)*

68.    Defendant Surefire, LLC invoked the popular television show Game of Thrones and its ominous message of "winter is coming" to encourage sales of its products to consumers who wish to be "properly equipped" for a frightening future.



*Surefire, LLC Instagram Advertisement (December 10, 2021)*

69.     Defendant BCM similarly promoted its rifles—which are undisputedly deadly weapons—as "[l]ife saving tools."



*BCM Facebook Advertisement (January 22, 2020)*

70.     In promoting sales of its F-15 lower reciever, the weapon component subsequently purchased by the Shooter, Defendant Centurion Arms represented to its customers: "New F-15 lowers!!! We have been warned that to defend ourselves from a tyrannical crime syndicate we need to have F-15s and Nukes!!! Since the American people have been threatened we feel people should have the option to have their own F-15s!!!! Also a portion of each sale will go to an Ashli Babbitt fund. Ashli Babbitt was an un-armed 14 year Air Force veteran who was murdered earlier this year."[10]

---

[10]   Ashli Babbitt was "among a mob of people that entered the Capitol building" on January 6, 2021. U.S. Dep't of Just., *Department of Justice Closes Investigation into the Death of Ashli Babbitt* (Apr. 14, 2021), https://www.justice.gov/usao-dc/pr/department-justice-closes-investigation-death-ashli-babbitt. She was shot once in the shoulder by a Capitol Police Officer



*Centurion Arms Instagram Advertisement (June 25, 2021)*

71.     Defendant SOLGW has also promoted sales of its weapons on social media by stoking fear and predicting violent conflict between civilians: "If you give a man a fish you feed him for a day. If you teach a man to fish you feed him for life. If you give a man a SOLGW apocalypse gun, and enough ammo . . . he can take all the fish he needs from the poor bastard who thought he only needed a fishing pole. It's getting a little weird out there. . ."

---

as she tried to climb through doors that the mob had broken to try to gain access to the Chamber of the U.S. House of Representatives. *Id.* Prior to Defendant Centurion Arms posting its ad, the Department of Justice had investigated Ms. Babbitt's death and determined that it would not bring charges. *Id.*



*SOLGW Facebook Advertisement (October 24, 2021)*

72.     Defendant Fiocchi has also invoked the threat of an apocalyptic future in its advertising.



*Fiocchi Instagram Advertisement (February 28, 2020)*

73. And Defendant Fiocchi's advertisements tell consumers that the more guns and ammunition they have, the better off they will be, with hashtags like #nevertoomany, #nevertoomuch, and #buyitall.



*Fiocchi Instagram Advertisement (June 12, 2021)*



*Fiocchi Instagram Advertisement (June 4, 2021)*

74.     Defendant Federal Premium Ammunition also encourages consumers to acquire way more of its product than one could reasonably need for lawful use—enough to "drown[]" in.



*Federal Premium Ammunition Instagram Advertisement (September 3, 2021)*

75.     Defendants promote stockpiling their products as a means to secure an individual's safety when, in reality, Defendants know (or at least should know) that the presence of a firearm in a household increases the risk of danger to its occupants.[11]

76.     Defendants have ignored the very real danger posed by Defendants' products to their users and the general public. As Defendant Starline Brass said explicitly in the below Facebook advertisement from the month before the Shooting, Defendants and others in the gun industry continue to promote unlimited acquisition of their products, on the basis that they will make young men like the Shooter feel powerful:



*Starline Brass Facebook Advertisement (March 1, 2022)*

77.     Defendants' strategies appear designed to exploit adolescents' and young adults' attraction to impulsive, thrill-seeking behavior and their insecurities about their futures. And they are eerily reminiscent of the historical practices of the tobacco and alcohol industries, other industries that have exploited young consumers' vulnerability by designing advertisements that

---

[11]    *See, e.g.*, David M. Studdert, et al., *Homicide Deaths Among Adult Cohabitants of Handgun Owners in California, 2004 to 2016*, ANNALS OF INTERNAL MED. (June 2022), https://doi.org/10.7326/M21-3762.

promote thrill-seeking and self-esteem inflating conduct in order to hook them early and convert them into lifelong purchasers of their products.[12]

78.     Defendants also make blatant appeals to youth and young adults by using graphic novel and video game-like imagery in their advertisements and by plainly featuring children and toys in their advertisements.

79.     For example, Defendant Daniel Defense promotes its rifles' placement in violent video games geared towards young men like the Shooter, who are particularly susceptible to be influenced by violent imagery. The Daniel Defense DDM4 V7S rifle—a short-barreled version of the Shooter's DDM4 V7—is featured in *Call of Duty: Modern Warfare*, and the company's social media advertisements specifically reference *Call of Duty* and the hashtags #callofduty and #cod in posts.

---

[12] *See* BOSTON UNIVERSITY CENTER ON ALCOHOL MARKETING AND YOUTH, Alcohol Advertising and Youth (2007) (research indicates that, in addition to parents and peers, alcohol advertising and marketing have a significant impact on youth decisions to drink); John J. Pierce et al., *Ass'n Between Receptivity to Tobacco Advertising and Progression to Tobacco Use in Youth and Young Adults in the PATH Study*, 172 JAMA PEDIATR. 444 (May 2018) ("Our study reinforces that tobacco product marketing continues to be an important contributor to tobacco use among young people.").



*Daniel Defense Facebook Advertisement (October 25, 2019)*



*Daniel Defense Instagram Advertisement (June 7, 2021)*

80.     Video games like *Call of Duty* give young men like the Shooter the opportunity to

simulate the experience of shooting at others in a theater of war, using AR-15 rifles styled after

those made by Defendant Daniel Defense and others. Defendant Daniel Defense's joint advertising with *Call of Duty* enables it to reach countless young men who gravitate towards realistic reenactments of violent warfare. Video games like *Call of Duty* have been attractive to several young men who have committed mass shootings—including at Sandy Hook and Parkland, and in Uvalde and El Paso.

81.     Defendant BCM also collaborated with the Black Powder Red Earth® graphic novel series to have its weapons featured in illustrations and toys for the series, and then posted those illustrations and toys on its Instagram account. And it ensured its advertisements would reach a wide range of civilians—and particularly young men like the Shooter—by including hashtags like     #warcomics,     #murderingheartsandminds,     #chaosanddiscontent,     #igcomicbooks, #graphicnovels, #comicbooks, #comicbookart, and #comicsofinstagram.



*BCM Instagram Advertisement (November 24, 2021)*



*BCM Instagram Advertisement (November 24, 2020)*



*BCM Instagram Advertisement (October 23, 2020)*



*BCM Instagram Advertisement (June 25, 2018)*

82.     Similarly, Defendant Centurion Arms has advertised its weapons products with images featuring video game-like masks covering the would-be shooter's face and expanded its advertisements' reach with the #igmilitia hashtag.



*Centurion Arms Instagram Advertisement (November 3, 2021)*

83.    Defendant Daniel Defense also routinely promotes advertisements that blend its violent weaponry with well-known pop culture references to ensure its advertising is attractive to young men who are particularly susceptible to these deceptive marketing practices.



*Daniel Defense Twitter Advertisement (October 31, 2021)*



*Daniel Defense Instagram Advertisement (October 31, 2021)*

84.     This includes posting an image of its MK18 AR-15 rifle with popular musician Post

Malone, again with the #gunporn hashtag to broaden its advertisement's reach.



*Daniel Defense Instagram Advertisement (January 23, 2020)*

85.     Some of the Defendants also start marketing to kids before they are even old enough to read, play video games, or follow pop culture references.

86.     In multiple Instagram posts featuring very young children, Defendant Fiocchi advises consumers to "[s]tart[] them" and "[t]each them young!"



*Fiocchi Instagram Advertisement (August 5, 2021)*



*Fiocchi Instagram Advertisement (October 26, 2020)*

87.    And Defendant FosTecH even puts its guns in children's hands for social media content.



*FosTecH Instagram Advertisement (March 5, 2022)*

88.    Despite the training and potential permits needed to properly and legally handle a firearm and its ammunition, Defendants portray these deadly products as literally child's play by explicitly comparing bullets to crayons, and claiming that "anyone" can install their products, including a young girl with a toy oven.



*Starline Brass Facebook Advertisement (March 31, 2022)*

40



*Griffin Armament Instagram Advertisement (April 29, 2020)*

89.     To market their weapons, weapon accessories, and ammunition, Defendants maintain an active presence on social media, through platforms such as Twitter, Instagram, Facebook, and YouTube. Notably, they do not include any legal or regulatory disclosures on their social media accounts, including any warnings about the dangers of assault rifles.

90.     Defendants knew or should have known that their social media advertising contains content that is not suitable for all audiences, but did nothing to keep it from reaching would-be perpetrators of violence like the Shooter.

91.     To the contrary, Defendant FosTecH specifically asked consumers of its content to adjust their Instagram settings so that they would continue to get FosTecH's posts that "could be upsetting or offensive."



*FosTecH Instagram Advertisement (July 22, 2021)*

92.     And Defendant SOLGW went so far as to complain about Instagram removing its posts for "coordinating harm or promoting crime" and for promoting the "sale of illegal or regulated goods."



*SOLGW Instagram Advertisement (November 15, 2021)*

42



*SOLGW Instagram Advertisement (April 10, 2021)*

93.     Defendant SOLGW therefore cannot claim ignorance as to the entirely foreseeable impacts of its advertising when a platform that it uses to advertise has plainly informed SOLGW that its posts are dangerous.

### c.   Defendants' Ads Promote Activity that Is or May Be Illegal

94.     Despite some content moderation on social media sites, Defendants Daniel Defense, BCM, SOLGW, and others have been undeterred from advertising their products in connection with activity that is or may be illegal in some or all jurisdictions—without any regard to where the consumer is viewing the ad from. This content, too, appeals to the thrill-seeking impulses of young men like the Shooter. In fact, the Shooter used Defendants' weapons just as they encouraged him to in their marketing—targeting Ms. Lowy's car with a scope, and riddling it with as many bullet holes as he could.

95.     In an Instagram ad published just over a month before the shooting, Defendant Daniel Defense promoted imagery of a rifle with a rifle scope on a rooftop, targeting a car on a public street. An Instagram user asked, in response to the post titled "Rooftop Ready": "Is this an assassins setup? And can I buy this?" Daniel Defense's official account's response was to suggest

that "anyone" could use this "assassin's setup": "More geared toward MIL/LE but adaptable to anyone. Yes, our Delta 5 Pro 16" is live on our site right now!" (MIL/LE is a reference to military and law enforcement).



*Daniel Defense Instagram Advertisement (March 2, 2022)*

96.    And in another ad that bears a sinister resemblance to the Shooter's attack on Ms. Lowy as she sat in her car in the school pick up line, BCM touts one of its rifles as a "120ish yard hole puncher" that will shoot through cars—something that no law-abiding civilian needs to be able to do.



*BCM Instagram Advertisement (July 30, 2019)*

97.     And Defendants FAB and FosTecH have advertised their weapons positioned in seats of vehicles, even though it is illegal in some jurisdictions (including in D.C.,[13] where the Shooter carried Defendants' weapons to execute the Shooting) to carry an unsecured weapon in the passenger compartment of a vehicle.



*FAB Instagram Advertisement (September 13, 2020)*

---

[13]     D.C. Code Ann. § 22-4504.02(b)(1).



*FosTecH Instagram Advertisement (October 1, 2021)*

98.     Defendant FosTecH has also repeatedly advertised its "echo" trigger modification, which is designed to allow a shooter to "make it rain" bullets by firing a bullet both when the trigger is pulled and when it is released.



*FosTecH Facebook Advertisement (August 21, 2021)*

99.     Defendant FosTecH advertised this product to increase the number of bullets that a weapon can fire with a single pull of the trigger without informing consumers that such a product would likely make their weapon a machine gun.

100.    And with even less regard for the law, Defendant SOLGW advertises the fully automatic setting on its weapons as the "no fucks" setting.



*SOLGW Instagram Advertisement (June 23, 2021)*

101.    Defendant SOLGW has also incorporated misogynistic jokes into its promotion of illegal firearms activity. In 2022, as Canadian officials considered firearm restrictions, SOLGW posted an image reading: "Her: I bet his search history is nothing but porn. His search history: [Google search bar reading how to send machine guns to Canada]."



*SOLGW Instagram Advertisement (February 14, 2022)*

102.    And in reference to a possible modification to make a weapon fire as fully automatic, Defendant SOLGW posted a picture of a lower receiver, which the Shooter purchased from SOLGW's brand, with the caption: "Hey girl, are you a 80% lower? B[ecause] I wanna drill your third hole and not tell anyone about you[.]"



*SOLGW Instagram Advertisement (April 14, 2021)*

103.    The Shooter had three fully automatic rifles at his disposal on the day of the Shooting.



*Crime Scene Photo from Shooter's D.C. Apartment*



*Crime Scene Photo from Shooter's D.C. Apartment*

**d.  Defendants Knew that Adolescents and Young Adults Are Prone to Risky and Thrill-Seeking Behavior**

104.    Defendants knew or should have known of the risks of their deceptive marketing

and related conduct, as the growing numbers of mass shootings involving assault rifles each year

repeatedly and consistently show. From January 2012 through July 2022, 70 percent of the 10 mass shootings with the highest counts of gunshot injuries and deaths were perpetrated by male shooters who were between the ages of 18 and 26.[14]

105.    It is well known that adolescent and young men between the ages of 15 and 24 are highly susceptible to product advertising and more likely than other age groups to engage in risky, thrill-seeking, violent, and impulsive behavior.

106.    Defendants' deceptive marketing targets and exploits this demographic by promoting advertising that is specifically appealing to—and encouraging of—this group's propensities for violent behavior. The Shooter who terrorized the Edmund Burke School was 23 years old.

107.    In 2017, the Shooter joined the United States Coast Guard, but was discharged before completing basic training. Upon information and belief, the United States Coast Guard discharged the Shooter because it learned of attributes that made him unfit for military service.

108.    In the months leading up to the Shooting, the Shooter purchased more than 15 firearms or firearm accessories and amassed thousands of rounds of ammunition. At just his D.C. apartment crime scene, the Shooter had approximately 1,000 rounds of ammunition.

109.    Decades of scientific evidence demonstrate that the onset of intense, thrill-seeking urges associated with puberty outpaces the development of the area of the brain responsible for judgment and impulse control, which continues into young adulthood.[15]

---

[14]    Complaint and Request for Investigation of Daniel Defense LLC from Everytown Law to Samuel Levine, Director, Fed. Tr. Comm'n, Bureau of Consumer Protection at 26–27 (July 15, 2022), available at https://everytownlaw.org/documents/2022/07/daniel-defense-ftc-complaint.pdf/.

[15]    *See, e.g.*, Cornelia Pechmann et al., *Impulsive and Self-Conscious: Adolescents' Vulnerability to Advertising and Promotion*, 24 J. Pub. Pol'y & Mktg. 202, 203–07 (2005); *see also* Laurence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk Taking*, 28

110.    As a result, adolescents and post-adolescents have less capacity for mature judgment and self-control than older adults and are more likely to engage in risky behaviors.[16]

111.    Adolescents and young men are particularly receptive to advertisements that depict impulsive, thrill-seeking behavior.[17]

112.    Negative emotions such as anger, depression, and anxiety—which are more strongly felt by adolescents—can dilute the already weak control adolescents and post-adolescents exercise over their impulses and urges.[18]

113.    Studies have further shown that this predilection for risky, thrill-seeking behavior extends to violent criminal behavior. A disproportionate amount of violent crime in the United States is committed by individuals between the ages of 15 and 24.[19] And as discussed above, adolescents and young men disproportionately represent the demographic of the most destructive mass shooters.

---

DEVELOPMENTAL REV. 78 (2008); Agnieszka Tymula et al., *Adolescents' Risk-Taking Behavior Is Driven by Tolerance to Ambiguity*, 109 PNAS 17135 (Oct. 16, 2012).

[16]    Cornelia Pechmann et al., *Impulsive and Self-Conscious: Adolescents' Vulnerability to Advertising and Promotion*, 24 J. PUB. POL'Y & MKTG. 202, 203–07 (2005); *see also* Laurence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk Taking*, 28 DEVELOPMENTAL REV. 78 (2008); Agnieszka Tymula et al., *Adolescents' Risk-Taking Behavior Is Driven by Tolerance to Ambiguity*, 109 PNAS 17135 (Oct. 16, 2012); *see also* Glenn Thrush & Matt Richtel, *A Disturbing New Pattern in Mass Shootings: Young Assailants*, N.Y. TIMES (June 2, 2022).

[17]    *See* Pechmann et al., *supra* note 16, at 202, 214.

[18]    *See* Pechmann et al., *supra* note 16, at 207–09; *see also* Lisa Rapaport, *Emotional Distress Tied to Weapon Use for Teens*, REUTERS (Feb. 5, 2016); Renata Sikora, *Risk Behaviors at Late Childhood and Early Adolescence as Predictors of Depression Symptoms*, 17 CURRENT PROBLEMS OF PSYCHIATRY 173 (2016).

[19]    Brad J. Bushman et al., *Youth Violence: What We Know and What We Need to Know*, 71 AM. PSYCH. 17, 18 (2016); *see also* Everytown for Gun Safety, *Permitless Carry: Carrying a Concealed Gun in Public with No Permit and No Training* (Feb. 2020).

114.     As the makers of assault rifles, rifle accessories, and ammunition that have been used in mass shootings, Defendants are aware that these age groups are more likely to engage in risky, thrill-seeking, violent, and impulsive behavior.

115.     Despite this knowledge, Defendants continued marketing their weapons, accessories, and ammunition in a manner that would appeal to thrill-seeking young men who crave the power and destruction of a military weapon and all of its accessories, fully knowing and appreciating that the growth of their product lines was due in part to their appeal to a younger demographic of users. Defendants' marketing and advertising therefore foreseeably led to the mass shooting at the Edmund Burke School.

116.     Each Defendant amassed a following on social media to promote their products. None restricted their product-promoting posts to their followers. To the contrary, Defendants used hashtags to connect with those who were not already following them and to target consumers.

117.     Defendants Daniel Defense, BCM, FAB, Griffin Armament, Centurion Arms, SOLGW, and FosTecH's marketing of assault rifles worked as intended on the Shooter, leading him to self-identify as "an AR-15 aficionado" on Wikipedia.[20]

118.     The Shooter used that Wikipedia account identifying him as "an AR-15 aficionado" to update the page for the Edmund Burke School as police searched for him. He wrote: "A gunman shot at the school on April 22, 2022. The suspect is still at large."[21] As police continued to search for him hours after he had posted about the Shooting online under his own name, the Shooter posted again: "Your taxes pay for these incompetent fools."

---

[20]   *See* Peter Hermann, *Inside the Race to Find the Gunman Raining Bullets on a D.C. School*, WASH. POST (May 12, 2022, 6:00 AM).

[21]   *See* Peter Hermann et al., *Raymond Spencer Left an Online Footprint After D.C. Shooting,* WASH. POST (Apr. 23, 2022, 11:45 AM).

119.    Just as Defendant Starline Brass told him through its advertising, the Shooter's stockpile of weapons, weapon accessories, and ammunition had made him feel powerful— powerful enough to livestream his crime and taunt police under his own name.

120.    Though he owned numerous other weapons, weapon accessories, and boxes of ammunition, Defendants' products were his weapons, weapon accessories, and ammunition of choice. Upon information and belief, the Shooter made these choices because he perceived these weapons, accessories, and ammunition to be a superior fit for carrying out his mission of causing the most destruction possible.

121.    Upon information and belief, the Shooter assembled Defendants' products to create customized weapons of war for use in the Shooting. The Shooter's online presence suggests that he did so after searching online for how-to instructions and instructional videos.

122.    The Shooter also purchased various weapons, weapon accessories, and ammunition online from a number of retailers, exposing the Shooter to Defendants' products and advertisements in a variety of forums.

123.    Upon information and belief, the Shooter was exposed to and influenced by Defendants' deceptive and unfair marketing acts and practices while researching and planning the Shooting.

124.    Defendants' deceptive and unfair marketing acts and practices increased the level of violence of the Edmund Burke Shooting by putting in the Shooter's hands deadly weapons, accessories, and ammunition that he thought were together designed for mass death.

**The Shooting's Impact on Ms. Lowy, N.T., and Their Family**

125.    Ms. Lowy, her daughter N.T., her husband, Daniel Jaffe, and their children, are among the multiple victims of the Shooting whose lives will never be the same.

126.    On April 22, 2022, Ms. Lowy was waiting in her car to pick N.T. up from the Edmund Burke School. N.T. was gathering her belongings at her locker.

127.    But everything changed when the Shooter opened fire from his apartment overlooking the campus. Bullets pierced Ms. Lowy's car, hitting and gravely wounding her. N.T. fled with her classmates and teachers to the science lab, where she started texting her family.

128.    Secret Service Agents responding to the Shooting found a critically injured Ms. Lowy lying in the street, provided emergency care to her bullet wounds, and carried her to emergency medical services.

129.    Ms. Lowy's heart stopped as she was rushed to a local trauma center. She was resuscitated by emergency medical teams twice.

130.    Emergency room physicians cut Ms. Lowy's chest open in the trauma bay— performing an emergency thoracotomy due to her cardiac arrest from the gunshot wounds.

131.    Ms. Lowy was then rushed to the Operating Room to control her hemorrhaging. Surgeons noted multiple metal fragments—bullet pieces from Defendants Fiocchi, Federal Premium Ammunition, and/or Starline Brass's ammunition—in Ms. Lowy's body.

132.    After Ms. Lowy was taken from her vehicle to the hospital, her husband Mr. Jaffe saw news coverage of the Shooting that included an image of a SWAT team member standing next to Ms. Lowy's car.

133.    During this time, none of Ms. Lowy's family members could reach her.

134.    Mr. Jaffe called the Metropolitan Police Department to ask them to notify him if they had any news about Ms. Lowy. He received no response.

135.    Inside Edmund Burke, as the children continued to be sheltered in place, N.T. told police that she couldn't reach her mother. They asked for a description of Ms. Lowy's car, exchanged glances when N.T. provided it, and then ended the conversation.

136.    Hours later—around 9pm—N.T. was reunited with the rest of the family. The family waited at the reunification center, hoping that Ms. Lowy would get off of a bus that had transported adult survivors of the Shooting. She never did.

137.    Left wondering where Ms. Lowy was and whether she was alive, Mr. Jaffe called around to local hospitals.

138.    Finally, the family learned that a woman matching Ms. Lowy's description had been admitted to Washington Hospital Center. The family rushed to the hospital, where Mr. Jaffe identified Ms. Lowy in the Intensive Care Unit.

139.    Ms. Lowy remained hospitalized for several weeks, enduring numerous other procedures after her initial emergency surgery.

140.    In the weeks and months following her initial hospitalization, Ms. Lowy attended countless doctors' appointments and physical and occupational therapy sessions in an effort to physically and mentally recover from the Shooting.

141.    To this day, Ms. Lowy continues to require ongoing medical care as a consequence of the Shooting. She has been diagnosed with an anoxic brain injury, post-traumatic stress disorder, and major depression.

142.    In addition to routine medical care for the lasting injuries she suffered, Ms. Lowy has endured additional procedures to attempt to remove shrapnel from Defendants' bullets that remains in her body and causes pain. Because the latest of these procedures was unsuccessful, Ms.

Lowy would need to undergo an invasive surgery under general anesthesia to have any hope of removing the pieces of Defendants' ammunition.

143.    Ms. Lowy's injuries also forced her to take a leave of absence of nearly a year from her job as an attorney. Ms. Lowy has only recently returned to work, and she continues to have concerns about her ability to resume the career path that she was on before the Shooting.

144.    Ms. Lowy has also incurred and will continue to incur damages as a result of Defendants' conduct in the form of medical expenses, loss of income, and pain and suffering.

145.    N.T. struggled to return to Edmund Burke School after the Shooting, and ultimately switched schools because it was too difficult to relive the Shooting everyday while walking through the school bridge that the Shooter targeted in the Shooting.

146.    N.T. has suffered severe emotional distress as a result of the Shooting. For example, N.T. has requested that she be notified in advance of any shelter-in-place drills at her new school, which are too painful and traumatic for her to participate in with her classmates.

147.    N.T. has also been routinely attending therapy as a result of the Shooting, causing her and Ms. Lowy to incur damages as a result of Defendants' conduct in the form of medical expenses.

## COUNT I
### Violation of Virginia False Advertising Statute (Va. Code Ann. § 18.2-216)
### (Against Defendant Daniel Defense, LLC)

148.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

149.    Defendant Daniel Defense, LLC advertised to Virginia residents such as the Shooter.

150.    Defendant Daniel Defense, LLC's Facebook, Instagram, Twitter and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein,

contained one or more representations that were untrue, deceptive, or misleading. Defendant Daniel Defense, LLC untruthfully, deceptively, or misleadingly promoted its weapons as suitable for war and civilian use, beneficial to safety and security, capable of safe handling by children, and/or appropriate for uses that are or may be illegal in some or all U.S. jurisdictions.

151.    Defendant Daniel Defense, LLC's Facebook, Instagram, Twitter and other advertising posts were made with the intent to sell or to induce the public to enter into an obligation.

152.    Defendant Daniel Defense, LLC's DDM4 V7 rifle and DD magazine were used to harm Ms. Lowy and N.T.

153.    Ms. Lowy has sustained damages as a result of the harmful use of Defendant Daniel Defense, LLC's DDM4 V7 rifle and DD magazine, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

154.    N.T. has also sustained damages as a result of the harmful use of Defendant Daniel Defense, LLC's DDM4 V7 rifle and DD magazine, including but not limited to severe emotional distress and medical expenses.

**COUNT II**
**Violation of Virginia False Advertising Statute (Va. Code Ann. § 18.2-216)**
**(Against Defendants FAB Defense, Inc. and FAB Manufacturing & Import of Industrial Equipment Ltd. (the "FAB Defendants"))**

155.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

156.    The FAB Defendants advertised to Virginia residents such as the Shooter.

157.    The FAB Defendants' Instagram and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, contained one or more representations that were untrue, deceptive, or misleading. The FAB Defendants untruthfully, deceptively, or misleadingly promoted their weapons as suitable for war and civilian use, beneficial to safety and

security, capable of safe handling by children, and/or appropriate for uses that are or may be illegal in some or all U.S. jurisdictions.

158.    The FAB Defendants' Instagram and other advertising posts were made with the intent to sell or to induce the public to enter into an obligation.

159.    The FAB Defendants' buttstock was used to harm Ms. Lowy and N.T.

160.    Ms. Lowy has sustained damages as a result of the harmful use of the FAB Defendants' buttstock, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

161.    N.T. has also sustained damages as a result of the harmful use of Defendant FAB Defendants' buttstock, including but not limited to severe emotional distress and medical expenses.

**COUNT III**
**Violation of Virginia False Advertising Statute (Va. Code Ann. § 18.2-216)**
**(Against Defendant Bravo Company USA, Inc. ("BCM"))**

162.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

163.    Defendant BCM advertised to Virginia residents such as the Shooter.

164.    Defendant BCM's Facebook, Instagram, and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, contained one or more representations that were untrue, deceptive, or misleading. Defendant BCM untruthfully, deceptively, or misleadingly promoted its weapons as suitable for war and civilian use, beneficial to safety and security, capable of safe handling by children, and/or appropriate for uses that are or may be illegal in some or all U.S. jurisdictions.

165.    Defendant BCM's Facebook, Instagram, and other advertising posts were made with the intent to sell or to induce the public to enter into an obligation.

166.    Defendant BCM's AR-15 weapon and M-Lok system were used to harm Ms. Lowy and N.T.

167.    Ms. Lowy has sustained damages as a result of the harmful use of Defendant BCM's AR-15 weapon and M-Lok system, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

168.    N.T. has also sustained damages as a result of the harmful use of Defendant BCM's AR-15 weapon and M-Lok system, including but not limited to severe emotional distress and medical expenses.

## COUNT IV
### Violation of Virginia False Advertising Statute (Va. Code Ann. § 18.2-216)
### (Against Defendant Loyal 9 Manufacturing, LLC ("SOLGW"))

169.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

170.    Defendant SOLGW advertised to Virginia residents such as the Shooter.

171.    Defendant SOLGW's Facebook, Instagram, and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, contained one or more representations that were untrue, deceptive, or misleading. Defendant SOLGW untruthfully, deceptively, or misleadingly promoted its weapons as suitable for war and civilian use, beneficial to safety and security, capable of safe handling by children, and/or appropriate for uses that are or may be illegal in some or all U.S. jurisdictions.

172.    Defendant SOLGW's Facebook, Instagram, and other advertising posts were made with the intent to sell or to induce the public to enter into an obligation.

173.    Defendant SOLGW's lower receiver was used to harm Ms. Lowy and N.T.

174.   Ms. Lowy has sustained damages as a result of the harmful use of Defendant SOLGW's lower receiver, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

175.   N.T. has also sustained damages as a result of the harmful use of Defendant SOLGW's lower receiver, including but not limited to severe emotional distress and medical expenses.

**COUNT V**
**Violation of Virginia False Advertising Statute (Va. Code Ann. § 18.2-216)**
**(Against Defendant FOSTECH, Inc. ("FosTecH"))**

176.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

177.   Defendant FosTecH advertised to Virginia residents such as the Shooter.

178.   Defendant FosTecH's Facebook, Instagram, and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, contained one or more representations that were untrue, deceptive, or misleading. Defendant FosTecH untruthfully, deceptively, or misleadingly promoted its weapons as suitable for war and civilian use, beneficial to safety and security, capable of safe handling by children, and/or appropriate for uses that are or may be illegal in some or all U.S. jurisdictions.

179.   Defendant FosTecH's Facebook, Instagram, and other advertising posts were made with the intent to sell or to induce the public to enter into an obligation.

180.   Defendant FosTecH's AR-15 rear was used to harm Ms. Lowy and N.T.

181.   Ms. Lowy has sustained damages as a result of the harmful use of Defendant FosTecH's AR-15 rear, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

182.     N.T. has also sustained damages as a result of the harmful use of Defendant FosTecH's AR-15 rear, including but not limited to severe emotional distress and medical expenses.

## COUNT VI
### Violation of Virginia False Advertising Statute (Va. Code Ann. § 18.2-216) (Against Defendant Hearing Protection, LLC ("Griffin Armament"))

183.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

184.     Defendant Griffin Armament advertised to Virginia residents such as the Shooter.

185.     Defendant Griffin Armament's Instagram and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, contained one or more representations that were untrue, deceptive, or misleading. Defendant Griffin Armament untruthfully, deceptively, or misleadingly promoted its weapons as suitable for war and civilian use, beneficial to safety and security, capable of safe handling by children, and/or appropriate for uses that are or may be illegal in some or all U.S. jurisdictions.

186.     Defendant Griffin Armament's Instagram and other advertising posts were made with the intent to sell or to induce the public to enter into an obligation.

187.     Defendant Griffin Armament's MK1 lower was used to harm Ms. Lowy and N.T.

188.     Ms. Lowy has sustained damages as a result of the harmful use of Defendant Griffin Armament's MK1 lower, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

189.     N.T. has also sustained damages as a result of the harmful use of Defendant Griffin Armament's MK1 lower, including but not limited to severe emotional distress and medical expenses.

**COUNT VII**
**Violation of Virginia False Advertising Statute (Va. Code Ann. § 18.2-216)**
**(Against Defendant Centurion Arms, LLC ("Centurion Arms"))**

190.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

191.    Defendant Centurion Arms advertised to Virginia residents such as the Shooter.

192.    Defendant Centurion Arms' Instagram and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, contained one or more representations that were untrue, deceptive, or misleading. Defendant Centurion Arms untruthfully, deceptively, or misleadingly promoted its weapons as suitable for war and civilian use, beneficial to safety and security, capable of safe handling by children, and/or appropriate for uses that are or may be illegal in some or all U.S. jurisdictions.

193.    Defendant Centurion Arms' Instagram and other advertising posts were made with the intent to sell or to induce the public to enter into an obligation.

194.    Defendant Centurion Arms' F-15 receiver was used to harm Ms. Lowy and N.T.

195.    Ms. Lowy has sustained damages as a result of the harmful use of Defendant Centurion Arms' F-15 receiver, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

196.    N.T. has also sustained damages as a result of the harmful use of Defendant Centurion Arms' F-15 receiver, including but not limited to severe emotional distress and medical expenses.

**COUNT VIII**
**Violation of Virginia False Advertising Statute (Va. Code Ann. § 18.2-216)**
**(Against Defendant Magpul)**

197.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

198.    Defendant Magpul advertised to Virginia residents such as the Shooter.

199.    Defendant Magpul's Instagram, Twitter, and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, contained one or more representations that were untrue, deceptive, or misleading. Defendant Magpul untruthfully, deceptively, or misleadingly promoted its weapon accessories as suitable for war and civilian use, beneficial to safety and security, capable of safe handling by children, and/or appropriate for uses that are or may be illegal in some or all U.S. jurisdictions.

200.    Defendant Magpul's Instagram, Twitter, and other advertising posts were made with the intent to sell or to induce the public to enter into an obligation.

201.    Defendant Magpul's weapon accessories, including but not limited to its high-capacity drum and grip, were used to harm Ms. Lowy and N.T.

202.    Ms. Lowy has sustained damages as a result of the harmful use of Defendant Magpul's weapon accessories, including but not limited to its high-capacity drum and grip, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

203.    N.T. has also sustained damages as a result of the harmful use of Defendant Magpul's weapon accessories, including but not limited to severe emotional distress and medical expenses.

**COUNT IX**
**Violation of Virginia False Advertising Statute (Va. Code Ann. § 18.2-216)**
**(Against Defendants Federal Cartridge Company and Vista Outdoor, Inc. ("Federal Premium Defendants"))**

204.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

205.    The Federal Premium Defendants advertised to Virginia residents such as the Shooter.

206.    The Federal Premium Defendants' Instagram and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, contained one or more

representations that were untrue, deceptive, or misleading. The Federal Premium Defendants untruthfully, deceptively, or misleadingly promoted their ammunition as suitable for war and civilian use, beneficial to safety and security, capable of safe handling by children, and/or appropriate for uses that are or may be illegal in some or all U.S. jurisdictions.

207.    The Federal Premium Defendants' Instagram and other advertising posts were made with the intent to sell or to induce the public to enter into an obligation.

208.    The Federal Premium Defendants' ammunition was used to harm Ms. Lowy and N.T.

209.    Ms. Lowy has sustained damages as a result of the harmful use of the Federal Premium Defendants' ammunition, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

210.    N.T. has also sustained damages as a result of the harmful use of the Federal Premium Defendants' ammunition, including but not limited to severe emotional distress and medical expenses.

**COUNT X**
**Violation of Virginia False Advertising Statute (Va. Code Ann. § 18.2-216)**
**(Against Defendants Fiocchi of America, Inc. and Fiocchi Munizioni S.p.A. ("Fiocchi Defendants"))**

211.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

212.    The Fiocchi Defendants advertised to Virginia residents such as the Shooter.

213.    The Fiocchi Defendants' Instagram and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, contained one or more representations that were untrue, deceptive, or misleading. The Fiocchi Defendants untruthfully, deceptively, or misleadingly promoted their ammunition as suitable for war and civilian use, beneficial to safety

and security, capable of safe handling by children, and/or appropriate for uses that are or may be illegal in some or all U.S. jurisdictions.

214.    The Fiocchi Defendants' Instagram and other advertising posts were made with the intent to sell or to induce the public to enter into an obligation.

215.    The Fiocchi Defendants' ammunition was used to harm Ms. Lowy and N.T.

216.    Ms. Lowy has sustained damages as a result of the harmful use of the Fiocchi Defendants' ammunition, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

217.    N.T. has also sustained damages as a result of the harmful use of the Fiocchi Defendants' ammunition, including but not limited to severe emotional distress and medical expenses.

## COUNT XI
### Violation of Virginia False Advertising Statute (Va. Code Ann. § 18.2-216)
### (Against Defendant Starline, Inc.)

218.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

219.    Defendant Starline, Inc. advertised to Virginia residents such as the Shooter.

220.    Defendant Starline, Inc.'s Facebook and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, contained one or more representations that were untrue, deceptive, or misleading. Defendant Starline, Inc. untruthfully, deceptively, or misleadingly promoted its ammunition as suitable for war and civilian use, beneficial to safety and security, capable of safe handling by children, and/or appropriate for uses that are or may be illegal in some or all U.S. jurisdictions.

221.    Defendant Starline, Inc.'s Facebook and other advertising posts were made with the intent to sell or to induce the public to enter into an obligation.

222.    Defendant Starline, Inc.'s ammunition was used to harm Ms. Lowy and N.T.

223.    Ms. Lowy has sustained damages as a result of the harmful use of Defendant Starline, Inc.'s ammunition, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

224.    N.T. has also sustained damages as a result of the harmful use of Defendant Starline, Inc.'s ammunition, including but not limited to severe emotional distress and medical expenses.

**COUNT XII**
**Violation of Virginia False Advertising Statute (Va. Code Ann. § 18.2-216)**
**(Against Defendant Surefire, LLC)**

225.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

226.    Defendant Surefire, LLC advertised to Virginia residents such as the Shooter.

227.    Defendant Surefire, LLC's Instagram and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, contained one or more representations that were untrue, deceptive, or misleading. Defendant Surefire, LLC untruthfully, deceptively, or misleadingly promoted its magazines as suitable for war and civilian use, beneficial to safety and security, capable of safe handling by children, and/or appropriate for uses that are or may be illegal in some or all U.S. jurisdictions.

228.    Defendant Surefire, LLC's Instagram and other advertising posts were made with the intent to sell or to induce the public to enter into an obligation.

229.    Defendant Surefire, LLC's magazine was used to harm Ms. Lowy and N.T.

230.    Ms. Lowy has sustained damages as a result of the harmful use of Defendant Surefire, LLC's magazine, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

231.   N.T. has also sustained damages as a result of the harmful use of Defendant Surefire, LLC's magazine, including but not limited to severe emotional distress and medical expenses.

## COUNT XIII
### Violation of Virginia False Advertising Statute (Va. Code Ann. § 18.2-216)
### (Against Defendant Torkmag, Inc.)

232.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

233.   Defendant Torkmag, Inc. advertised to Virginia residents such as the Shooter.

234.   Defendant Torkmag, Inc.'s Instagram and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, contained one or more representations that were untrue, deceptive, or misleading. Defendant Torkmag, Inc. untruthfully, deceptively, or misleadingly promoted its magazines as suitable for war and civilian use, beneficial to safety and security, capable of safe handling by children, and/or appropriate for uses that are or may be illegal in some or all U.S. jurisdictions.

235.   Defendant Torkmag, Inc.'s Instagram and other advertising posts were made with the intent to sell or to induce the public to enter into an obligation.

236.   Defendant Torkmag, Inc.'s magazine was used to harm Ms. Lowy and N.T.

237.   Ms. Lowy has sustained damages as a result of the harmful use of Defendant Torkmag, Inc.'s magazine, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

238.   N.T. has also sustained damages as a result of the harmful use of Defendant Torkmag, Inc.'s magazine, including but not limited to severe emotional distress and medical expenses.

**COUNT XIV**
**Violation of Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 *et seq*.)**
**(Against Defendant Daniel Defense, LLC)**

239.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

240.    Defendant Daniel Defense, LLC advertised to Virginia residents such as the Shooter.

241.    Defendant Daniel Defense, LLC's Facebook, Instagram, Twitter and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, misrepresented that its DDM4 V7 rifle and DD magazine have certain characteristics, uses, or benefits; or misrepresented that they have a particular standard, quality, grade, style, or model; or otherwise used deception or misrepresentation. *See* Va. Code Ann. § 59.1-200.

242.    The misrepresentations in Defendant Daniel Defense, LLC's advertisements were an expression of existing fact.

243.    Upon information and belief, the Shooter relied on Defendant Daniel Defense, LLC's advertisements to purchase the DDM4 V7 rifle and DD magazine.

244.    Upon information and belief, the Shooter's reliance on Defendant Daniel Defense, LLC's advertisements was reasonable because Defendant Daniel Defense, LLC represented the content in its advertisements to be true and presented it in such a way to induce a reasonable person to believe it.

245.    Defendant Daniel Defense, LLC's DDM4 V7 rifle and DD magazine were used to harm Ms. Lowy and N.T.

246.    Ms. Lowy has sustained damages as a result of the harmful use of the Defendant Daniel Defense, LLC's DDM4 V7 rifle and DD magazine, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

247. N.T. has also sustained damages as a result of the harmful use of Defendant Daniel Defense, LLC's DDM4 V7 rifle and DD magazine, including but not limited to severe emotional distress and medical expenses.

**COUNT XV**
**Violation of Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 *et seq.*)**
**(Against Defendants FAB Defense, Inc. and FAB Manufacturing & Import of Industrial Equipment Ltd. (the "FAB Defendants"))**

248. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

249. The FAB Defendants advertised to Virginia residents such as the Shooter.

250. The FAB Defendants' Instagram and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, misrepresented that their buttstock has certain characteristics, uses, or benefits; or misrepresented that it has a particular standard, quality, grade, style, or model; or otherwise used deception or misrepresentation. *See* Va. Code Ann. § 59.1-200.

251. The misrepresentations in the FAB Defendants' advertisements were an expression of existing fact.

252. Upon information and belief, the Shooter relied on the FAB Defendants' advertisements to purchase the buttstock.

253. Upon information and belief, the Shooter's reliance on the FAB Defendants' advertisements was reasonable because the FAB Defendants represented the content in their advertisements to be true and presented it in such a way to induce a reasonable person to believe it.

254. The FAB Defendants' buttstock was used to harm Ms. Lowy and N.T.

255.   Ms. Lowy has sustained damages as a result of the harmful use of the FAB Defendants' buttstock, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

256.   N.T. has also sustained damages as a result of the harmful use of the FAB Defendants' buttstock, including but not limited to severe emotional distress and medical expenses.

**COUNT XVI**
**Violation of Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 *et seq.*)**
**(Against Defendant Bravo Company USA, Inc. ("BCM"))**

257.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

258.   Defendant BCM advertised to Virginia residents such as the Shooter.

259.   Defendant BCM's Instagram, Facebook, and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, misrepresented that its AR-15 weapon and M-Lok system have certain characteristics, uses, or benefits; or misrepresented that they have a particular standard, quality, grade, style, or model; or otherwise used deception or misrepresentation. *See* Va. Code Ann. § 59.1-200.

260.   The misrepresentations in Defendant BCM's advertisement were an expression of existing fact.

261.   Upon information and belief, the Shooter relied on Defendant BCM's advertisements to purchase the AR-15 weapon and M-Lok system.

262.   Upon information and belief, the Shooter's reliance on Defendant BCM's advertisements was reasonable because Defendant BCM represented the content in its advertisements to be true and presented it in such a way to induce a reasonable person to believe it.

263.   Defendant BCM's AR-15 weapon and M-Lok system were used to harm Ms. Lowy and N.T.

264.   Ms. Lowy has sustained damages as a result of the harmful use of Defendant BCM's AR-15 weapon and M-Lok system, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

265.   N.T. has also sustained damages as a result of the harmful use of Defendant BCM's AR-15 weapon and M-Lok system, including but not limited to severe emotional distress and medical expenses.

**COUNT XVII**
**Violation of Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 *et seq.*)**
**(Against Defendant Loyal 9 Manufacturing, LLC ("SOLGW"))**

266.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

267.   Defendant SOLGW advertised to Virginia residents such as the Shooter.

268.   Defendant SOLGW's Facebook, Instagram, and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, misrepresented that its lower receiver has certain characteristics, uses, or benefits; or misrepresented that it has a particular standard, quality, grade, style, or model; or otherwise used deception or misrepresentation. *See* Va. Code Ann. § 59.1-200.

269.   The misrepresentations in Defendant SOLGW's advertisements were an expression of existing fact.

270.   Upon information and belief, the Shooter relied on Defendant SOLGW's advertisements to purchase the lower receiver.

271.   Upon information and belief, the Shooter's reliance on Defendant SOLGW's advertisements was reasonable because Defendant SOLGW represented the content in its

advertisements to be true and presented it in such a way to induce a reasonable person to believe it.

272.   Defendant SOLGW's lower receiver was used to harm Ms. Lowy and N.T.

273.   Ms. Lowy has sustained damages as a result of the harmful use of Defendant SOLGW's lower receiver, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

274.   N.T. has also sustained damages as a result of the harmful use of Defendant SOLGW's lower receiver, including but not limited to severe emotional distress and medical expenses.

**COUNT XVIII**
**Violation of Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 *et seq.*)**
**(Against Defendant FOSTECH, Inc. ("FosTecH"))**

275.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

276.   Defendant FosTecH advertised to Virginia residents such as the Shooter.

277.   Defendant FosTecH's Facebook, Instagram, and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, misrepresented that its AR-15 rear has certain characteristics, uses, or benefits; or misrepresented that it has a particular standard, quality, grade, style, or model; or otherwise used deception or misrepresentation. *See* Va. Code Ann. § 59.1-200.

278.   The misrepresentations in Defendant FosTecH's advertisements were an expression of existing fact.

279.   Upon information and belief, the Shooter relied on Defendant FosTecH's advertisements to purchase the AR-15 rear.

280.   Upon information and belief, the Shooter's reliance on Defendant FosTecH's advertisements was reasonable because Defendant FosTecH represented the content in its advertisements to be true and presented it in such a way to induce a reasonable person to believe it.

281.   Defendant FosTecH's AR-15 rear was used to harm Ms. Lowy and N.T.

282.   Ms. Lowy has sustained damages as a result of the harmful use of Defendant FosTecH's AR-15 rear, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

283.   N.T. has also sustained damages as a result of the harmful use of Defendant FosTecH's AR-15 rear, including but not limited to severe emotional distress and medical expenses.

### COUNT XIX
### Violation of Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 *et seq.*)
### (Against Defendant Hearing Protection, LLC ("Griffin Armament"))

284.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

285.   Defendant Griffin Armament advertised to Virginia residents such as the Shooter.

286.   Defendant Griffin Armament's Instagram and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, misrepresented that its MK1 lower has certain characteristics, uses, or benefits; or misrepresented that it has a particular standard, quality, grade, style, or model; or otherwise used deception or misrepresentation. *See* Va. Code Ann. § 59.1-200.

287.   The misrepresentations in Defendant Griffin Armament's advertisements were an expression of existing fact.

288. Upon information and belief, the Shooter relied on Defendant Griffin Armament's advertisements to purchase the MK1 lower.

289. Upon information and belief, the Shooter's reliance on Defendant Griffin Armament's advertisements was reasonable because Defendant Griffin Armament represented the content in its advertisements to be true and presented it in such a way to induce a reasonable person to believe it.

290. Defendant Griffin Armament's MK1 lower was used to harm Ms. Lowy and N.T.

291. Ms. Lowy has sustained damages as a result of the harmful use of Defendant Griffin Armament's MK1 lower, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

292. N.T. has also sustained damages as a result of the harmful use of Defendant Griffin Armament's MK1 lower, including but not limited to severe emotional distress and medical expenses.

## COUNT XX
### Violation of Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 *et seq.*)
### (Against Defendant Centurion Arms, LLC ("Centurion Arms"))

293. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

294. Defendant Centurion Arms advertised to Virginia residents such as the Shooter.

295. Defendant Centurion Arms' Instagram and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, misrepresented that its F-15 receiver has certain characteristics, uses, or benefits; or misrepresented that it has a particular standard, quality, grade, style, or model; or otherwise used deception or misrepresentation. *See* Va. Code Ann. § 59.1-200.

296.   The misrepresentations in Defendant Centurion Arms' advertisements were an expression of existing fact.

297.   Upon information and belief, the Shooter relied on Defendant Centurion Arms' advertisements to purchase the F-15 receiver.

298.   Upon information and belief, the Shooter's reliance on Defendant Centurion Arms' advertisements was reasonable because Defendant Centurion Arms represented the content in its advertisements to be true and presented it in such a way to induce a reasonable person to believe it.

299.   Defendant Centurion Arms' F-15 receiver was used to harm Ms. Lowy and N.T.

300.   Ms. Lowy has sustained damages as a result of the harmful use of Defendant Centurion Arms' F-15 receiver, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

301.   N.T. has also sustained damages as a result of the harmful use of Defendant Centurion Arms' F-15 receiver, including but not limited to severe emotional distress and medical expenses.

**COUNT XXI**
**Violation of Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 *et seq.*)**
**(Against Defendant Magpul)**

302.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

303.   Defendant Magpul advertised to Virginia residents such as the Shooter.

304.   Defendant Magpul's Instagram, Twitter, and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, misrepresented that its weapon accessories, including its high-capacity drum and its grip, have certain characteristics, uses, or

benefits; or misrepresented that they have a particular standard, quality, grade, style, or model; or otherwise used deception or misrepresentation. *See* Va. Code Ann. § 59.1-200.

305.  The misrepresentations in Defendant Magpul's advertisements were an expression of existing fact.

306. Upon information and belief, the Shooter relied on Defendant Magpul's advertisements to purchase its weapon accessories.

307. Upon information and belief, the Shooter's reliance on Defendant Magpul's advertisements was reasonable because Defendant Magpul represented the content in its advertisements to be true and presented it in such a way to induce a reasonable person to believe it.

308. Defendant Magpul's weapon accessories, including but not limited to its high-capacity drum and grip, were used to harm Ms. Lowy and N.T.

309. Ms. Lowy has sustained damages as a result of the harmful use of Defendant Magpul's weapon accessories, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

310. N.T. has also sustained damages as a result of the harmful use of Defendant Magpul's weapon accessories, including but not limited to severe emotional distress and medical expenses.

**COUNT XXII**
**Violation of Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 *et seq.*)**
**(Against Defendants Federal Cartridge Company and Vista Outdoor, Inc. ("Federal Premium Defendants"))**

311. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

312. The Federal Premium Defendants advertised to Virginia residents such as the Shooter.

313.  The Federal Premium Defendants' Instagram and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, misrepresented that their ammunition has certain characteristics, uses, or benefits; or misrepresented that it has a particular standard, quality, grade, style, or model; or otherwise used deception or misrepresentation. *See* Va. Code Ann. § 59.1-200.

314.  The misrepresentations in the Federal Premium Defendants' advertisements were an expression of existing fact.

315.  Upon information and belief, the Shooter relied on the Federal Premium Defendants' advertisements to purchase the ammunition.

316.  Upon information and belief, the Shooter's reliance on the Federal Premium Defendants' advertisements was reasonable because the Federal Premium Defendants represented the content in their advertisements to be true and presented it in such a way to induce a reasonable person to believe it.

317.  The Federal Premium Defendants' ammunition was used to harm Ms. Lowy and N.T.

318.  Ms. Lowy has sustained damages as a result of the harmful use of the Federal Premium Defendants' ammunition, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

319. N.T. has also sustained damages as a result of the harmful use of the Federal Premium Defendants' ammunition, including but not limited to severe emotional distress and medical expenses.

**COUNT XXIII**
**Violation of Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 *et seq.*)**
**(Against Defendants Fiocchi of America, Inc. and Fiocchi Munizioni S.p.A. ("Fiocchi Defendants"))**

320.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

321.     The Fiocchi Defendants advertised to Virginia residents such as the Shooter.

322.     The Fiocchi Defendants' Instagram and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, misrepresented that their ammunition has certain characteristics, uses, or benefits; or misrepresented that it has a particular standard, quality, grade, style, or model; or otherwise used deception or misrepresentation. *See* Va. Code Ann. § 59.1-200.

323.     The misrepresentations in the Fiocchi Defendants' advertisements were an expression of existing fact.

324.     Upon information and belief, the Shooter relied on the Fiocchi Defendants' advertisements to purchase the ammunition.

325.     Upon information and belief, the Shooter's reliance on the Fiocchi Defendants' advertisements was reasonable because the Fiocchi Defendants represented the content in their advertisements to be true and presented it in such a way to induce a reasonable person to believe it.

326.     The Fiocchi Defendants' ammunition was used to harm Ms. Lowy and N.T.

327.     Ms. Lowy has sustained damages as a result of the harmful use of the Fiocchi Defendants' ammunition, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

328. N.T. has also sustained damages as a result of the harmful use of the Fiocchi Defendants' ammunition, including but not limited to severe emotional distress and medical expenses.

**COUNT XXIV**
**Violation of Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 *et seq.*)**
**(Against Defendant Starline, Inc.)**

329. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

330. Defendant Starline, Inc. advertised to Virginia residents such as the Shooter.

331. Defendant Starline, Inc.'s Facebook and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, misrepresented that its ammunition has certain characteristics, uses, or benefits; or misrepresented that it has a particular standard, quality, grade, style, or model; or otherwise used deception or misrepresentation. *See* Va. Code Ann. § 59.1-200.

332. The misrepresentations in Defendant Starline, Inc.'s advertisements were an expression of existing fact.

333. Upon information and belief, the Shooter relied on Defendant Starline, Inc.'s advertisements to purchase the ammunition.

334. Upon information and belief, the Shooter's reliance on Defendant Starline, Inc.'s advertisements was reasonable because Defendant Starline, Inc. represented the content in its advertisements to be true and presented it in such a way to induce a reasonable person to believe it.

335. Defendant Starline, Inc.'s ammunition was used to harm Ms. Lowy and N.T.

336.    Ms. Lowy has sustained damages as a result of the harmful use of Defendant Starline, Inc.'s ammunition, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

337.    N.T. has also sustained damages as a result of the harmful use of Defendant Starline, Inc.'s ammunition, including but not limited to severe emotional distress and medical expenses.

**COUNT XXV**
**Violation of Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 *et seq.*)**
**(Against Defendant Surefire, LLC)**

338.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

339.    Defendant Surefire, LLC advertised to Virginia residents such as the Shooter.

340.    Defendant Surefire, LLC's Instagram and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, misrepresented that its magazines have certain characteristics, uses, or benefits; or misrepresented that they have a particular standard, quality, grade, style, or model; or otherwise used deception or misrepresentation. *See* Va. Code Ann. § 59.1-200.

341.    The misrepresentations in Defendant Surefire, LLC's advertisements were an expression of existing fact.

342.    Upon information and belief, the Shooter relied on Defendant Surefire, LLC's advertisements to purchase the magazine.

343.    Upon information and belief, the Shooter's reliance on Defendant Surefire, LLC's advertisements was reasonable because Defendant Surefire, LLC represented the content in its advertisements to be true and presented it in such a way to induce a reasonable person to believe it.

344.   Defendant Surefire, LLC's magazine was used to harm Ms. Lowy and N.T.

345.   Ms. Lowy has sustained damages as a result of the harmful use of Defendant Surefire, LLC's magazine, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

346.   N.T. has also sustained damages as a result of the harmful use of Defendant Surefire, LLC's magazine, including but not limited to severe emotional distress and medical expenses.

**COUNT XXVI**
**Violation of Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 *et seq.*)**
**(Against Defendant Torkmag, Inc.)**

347.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

348.   Defendant Torkmag, Inc. advertised to Virginia residents such as the Shooter.

349.   Defendant Torkmag, Inc.'s Instagram and other advertising pre-dating the Shooting, including but not limited to the advertising cited herein, misrepresented that its magazines have certain characteristics, uses, or benefits; or misrepresented that they have a particular standard, quality, grade, style, or model; or otherwise used deception or misrepresentation. *See* Va. Code Ann. § 59.1-200.

350.   The misrepresentations in Defendant Torkmag, Inc.'s advertisements were an expression of existing fact.

351.   Upon information and belief, the Shooter relied on Defendant Torkmag, Inc.'s advertisements to purchase the magazine.

352.   Upon information and belief, the Shooter's reliance on Defendant Torkmag, Inc.'s advertisements was reasonable because Defendant Torkmag, Inc. represented the content in its

advertisements to be true and presented it in such a way to induce a reasonable person to believe it.

353.    Defendant Torkmag, Inc.'s magazine was used to harm Ms. Lowy and N.T.

354.    Ms. Lowy has sustained damages as a result of the harmful use of Defendant Torkmag, Inc.'s magazine, including but not limited to past and future pain and suffering, medical expenses, and lost wages.

355.    N.T. has also sustained damages as a result of the harmful use of Defendant Torkmag, Inc.'s magazine, including but not limited to severe emotional distress and medical expenses.

## COUNT XXVII
### Negligence *Per Se* for Violations of the National Firearms Act
### (Against Defendants Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW)

356.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

357.    Defendants Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW are engaged in the business of selling firearms at wholesale or resale.

358.    Defendants Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW owed a duty of care to Ms. Lowy and N.T.

359.    Defendants Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW's duty of care was set in part by the National Firearms Act ("NFA")—a public safety law meant to curtail crime and provide for the incarceration of individuals committing crimes. *See* 26 U.S.C. § 5801 *et seq.*

360.    As members of the public injured by an individual using Defendants Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW's products converted to fire automatically, Ms. Lowy and N.T. are members of the class protected by the NFA.

361.     Defendants Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW's violation of the NFA was a proximate cause of Ms. Lowy's and N.T.'s injuries.

362.     Ms. Lowy's and N.T.'s injuries are of the sort intended to be prevented by the NFA.

## COUNT XXVIII
### Negligence *Per Se* for Violations of the Virginia Uniform Machine Gun Act
### (Against Defendants Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW)

363.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

364.     Defendants Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW are engaged in the business of selling firearms at wholesale or resale.

365.     Defendants Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW owed a duty of care to Ms. Lowy and N.T.

366.     Defendants Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW's duty of care was set in part by the Virginia Uniform Machine Gun Act ("UMGA")—a public safety law meant to curtail crime based on the legislature's understanding of the danger of machine guns. *See* Va. Code Ann. § 18.2-288 *et seq.*

367.     As members of the public injured by an individual using Defendants Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW's products converted to fire automatically, Ms. Lowy and N.T. are members of the class protected by the UMGA.

368.     Defendants Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW's violation of the UMGA was a proximate cause of Ms. Lowy's and N.T.'s injuries.

369.     Ms. Lowy's and N.T.'s injuries are of the sort intended to be prevented by the UMGA.

**COUNT XXIV**
**Negligence**
**(Against Defendants Daniel Defense; Magpul; FAB Manufacturing & Import of Industrial Equipment Ltd. ("FAB Manufacturing"); Fiocchi Munizioni S.p.A.; Surefire, LLC; and Torkmag, Inc.)**

370.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

371.    At all relevant times, Defendants Daniel Defense; Magpul; FAB Manufacturing; Fiocchi Munizioni; Surefire, LLC; and Torkmag, Inc. were subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.

372.    Defendants FAB Manufacturing and Fiocchi Munizioni also had a duty of reasonable care to protect the public, including Ms. Lowy and N.T., from reasonably foreseeable risks of harm from their products.

373.    Defendants Daniel Defense; Magpul; Surefire, LLC; and Torkmag, Inc. also had a duty of reasonable care to protect the public, including Ms. Lowy and N.T., from reasonably foreseeable risks of harm from their magazine accessories.

374.    At all relevant times, Defendants FAB Manufacturing and Fiocchi Munizioni had a duty to exercise reasonable care in the course of selling, advertising, and marketing their products. This includes refraining from any activity that creates a reasonably foreseeable risk that their products increase the lethality of weapons and/or ammunition in the hands of purchasers who would use such products to inflict harm on others.

375.    At all relevant times, Defendants Daniel Defense; Magpul; Surefire, LLC; and Torkmag, Inc. had a duty to exercise reasonable care in the course of selling, advertising, and marketing their magazine accessories. This includes refraining from any activity that creates a reasonably foreseeable risk that their accessories increase the lethality of weapons and/or ammunition in the hands of purchasers who would use such products to inflict harm on others.

376.    Defendants FAB Manufacturing and Fiocchi Munizioni also had a duty of reasonable care to market their products in a commercially reasonable manner, and to refrain from misleadingly and deceptively marketing these products in the manner described above to individuals who are foreseeably likely to handle these products irresponsibly.

377.    Defendants Daniel Defense; Magpul; Surefire, LLC; and Torkmag, Inc. also had a duty of reasonable care to market their magazine accessories in a commercially reasonable manner, and to refrain from misleadingly and deceptively marketing these accessories in the manner described above to individuals who are foreseeably likely to handle these accessories irresponsibly.

378.    At all relevant times, Defendants Daniel Defense; Magpul; FAB Manufacturing; Fiocchi Munizioni; Surefire, LLC; and Torkmag, Inc. knew or should have known that a breach of these duties would result in injury to others, including Ms. Lowy and N.T.

379.    Defendants FAB Manufacturing and Fiocchi Munizioni breached these duties to exercise reasonable care by advertising their products in ways that promote and encourage civilians—particularly among young men, a demographic that Defendants knew or should have known was susceptible to such marketing—to use their products in an illegal and dangerous way, and/or by advertising their products in a deceptive or misleading manner, as described at length herein.

380.    Defendants Daniel Defense; Magpul; Surefire, LLC; and Torkmag, Inc. breached these duties to exercise reasonable care by advertising their magazine accessories in ways that promote and encourage civilians—particularly among young men, a demographic that Defendants knew or should have known was susceptible to such marketing—to use their products in an illegal and dangerous way, and/or by advertising their accessories in a deceptive or misleading manner, as described at length herein.

381.     As a direct and proximate result of Defendants' conduct, Ms. Lowy suffered and continues to suffer from severe physical injuries, emotional distress, anxiety, depression, difficulty sleeping, and other related issues, in addition to serious and life-threatening physical injuries.

382.     As further direct and proximate result of Defendants' conduct, Ms. Lowy has incurred and will continue to incur damages in the form of past and future pain and suffering, medical expenses, and lost wages.

383.     N.T. has also sustained damages as a result of Defendants' conduct, including but not limited to severe emotional distress and medical expenses.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and that the Court:

a)       Award damages, on behalf of Plaintiff Karen Lowy in her individual capacity and as parent and next friend of minor child N.T., and against each of the Defendants in an amount necessary to compensate Plaintiffs for their losses, which exceed the minimum jurisdictional amount;

b)       Award trebled damages under the Virginia Consumer Protection Act for Defendants' willful violations of the Act;

c)       Award punitive damages in an amount to be shown at trial;

d)       Award pre-judgment and post-judgment interest;

e)       Award Plaintiffs costs and reasonable attorneys' fees incurred in this action; and

f)       Grant such other relief as the Court may deem just and proper.

**PLEASE TAKE NOTICE THAT PLAINTIFFS DEMAND A TRIAL BY JURY.**

Dated: October 1, 2023

Respectfully Submitted,

 */s/ Kathryn Ali*

**ALI & LOCKWOOD LLP**
Kathryn Ali (VSB # 97966)
Elizabeth Lockwood*
300 New Jersey Avenue NW, Suite 900
Washington, D.C. 20001
Phone: (202) 651-2476
katie.ali@alilockwood.com
liz.lockwood@alilockwood.com

**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**
H. Christopher Boehning*
Jacobus J. Schutte*
Jenifer N. Hartley*
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 373-3700
Fax: (212) 757-3990
cboehning@paulweiss.com
jschutte@paulweiss.com
jhartley@paulweiss.com

*\* Pro hac vice applications forthcoming*

*Attorneys for Plaintiffs*